We will hear argument next this morning in Case 11-9953, Boyer v. Louisiana. Mr. Bork. Mr. Chief Justice, and may it please the Court, the Louisiana Court of Appeal in this case correctly found that the majority of the delay, the seven-year delay, was caused by the lack of funding, but when moving to assess that cause under Barker, incorrectly determined that it was a cause beyond the control of the State, and adopting its earlier ruling under the State statute, found that it was a cause beyond the control of the State in the sense that it was beyond the control of the local district attorney's office. Mr. Bork, was it within the control of your client? He was unable to fund himself, Your Honor. That is why he asked for the appointment. Was he unable to get his Sixth Amendment right to a speedy trial? Yes. Why? That is, he was unable to move forward to trial because he was not provided with counsel adequately funded to advance that trial. He had one counsel, right, during the whole time? In fact, in a sense, Your Honor, he had two counsel. Part of it he had two, and then there was not enough funding for the second. Okay? So he was faced with a choice. Louisiana, as I understand it, has adopted a provision which the Sixth Amendment does not require. The Sixth Amendment just requires counsel. But Louisiana says in capital cases we are going to provide two counsel, and you can't go to trial until you have two counsel. Okay? No, Your Honor. That is not correct. That is not the State of Louisiana law. What is the State of Louisiana law? Louisiana absolutely does not provide a right to two counsel in capital cases. The Louisiana Supreme Court in Rule 31 provided that the court should appoint two counsel, but also provided expressly that that created no procedural or substantive right. Similarly, there is no right to two counsel. I don't understand that. That's not Louisiana law, that you can't proceed without two counsel? That's not the law in Louisiana?  That is not the law in Louisiana. You don't consider Supreme Court rules to be law? It is a Supreme Court rule which directs the trial judge to appoint two counsel. However, it makes it clear. Is it the fact that in Louisiana you cannot proceed to trial in a capital case unless there are two counsel? No, Your Honor. That is not the State of Louisiana. Then you don't have a case. You should have proceeded to trial. No, Your Honor. In this case, as the court of appeal correctly found, Mr. Boyer did not have adequate funding for the case to go to trial. The court of appeal did not predicate that on the need for two counsel. The motion to determine source of funds was not predicated on the need for two counsel. The one counsel who was qualified, what was his name? Mr. Lorenzi was lead certified counsel. He was the only one at the time who was qualified to be lead counsel. Correct. And the Louisiana Supreme Court said, you don't have to do this, you're his attorney, but you have a right to be paid and the State has to pay you. So there was no obligation on the counsel's part to do anything, and he kept asking, please have a funding order, let me be paid and I'll do my job. Yes. Mr. Lorenzi declined to pay for Mr. Boyer's defense out of his own pocket. Wasn't there at all times one counsel who was being paid by the State? There was. At all times? There was at all times one counsel appointed as associate counsel. That is for the purpose of assisting Mr. Lorenzi as lead counsel. Was that counsel qualified enough under our constitutional Sixth Amendment jurisprudence? Well, I don't understand the Sixth Amendment jurisprudence to place a qualification minimum. So I'm not sure I'm understanding your question. Well, the question is, would only lead counsel under the Supreme Court's rule qualify as competent counsel for purposes of complying with the constitutional requirement, or would this certified second chair qualify? There is no — I'm having trouble answering the question, Justice Scalia, because the two things don't talk to each other. The Sixth Amendment doesn't impose a certification requirement. Exactly. I'm just saying, can you establish that the one counsel that your client had throughout this whole proceeding would not satisfy the constitutional requirement? Can you — is there any basis for your saying that? Yes, Your Honor. The court of appeal twice found, knowing that associate counsel had been appointed, the court of appeal twice found that the case could not proceed due to a lack of adequate funding, and the State could not be able to proceed. Not because of a Federal constitutional reason. The court found you're not complying with the Supreme Court rule. You can't proceed without complying with the Supreme Court rule. It seems to me your client was faced with a choice. You could either demand what Louisiana in its generosity has given to capital defendants, namely the right to two counsel, whether it's by statute or by Supreme Court rule, it doesn't matter. You could either demand that right, or you could demand your right to a speedy trial. That was your choice. And it seems to me what counsel chose was to insist all along, I want my right to two counsel. You didn't have to take that right. You could have gone to the Supreme Court and said, you know, since it's taking so long, I demand my constitutional right to a speedy trial. But you didn't do that. Your Honor, if Mr. Boyer had been brought into court and had been told, we've got associate counsel here. They're qualified in the sense that they're barred in Louisiana, and they can take your case to trial and move it forward now. But if you wait, we might have funding for another lawyer here who will join him, is more senior and experienced, and will double your firepower. You can choose, Mr. Boyer, do you want to go ahead now with this guy, or do you want to wait? In that circumstance, there would not be an invidious choice between the right to counsel and the right to speedy trial. It would be, we're giving you constitutionally adequate counsel, and you can wait for better if you wish to. But that is not what occurred here. And, Justice Scalia, the court of appeals— Kennedy— Can you tell me why that is not what occurred here? Because the funding problem did not exist solely around Mr. Lorenzi's overhead and expenditure. There was no money for investigation. There were no money for experts. And the associate counsel who had been appointed had been appointed solely and for the limited purpose as an assistant to Mr. Lorenzi, not to conduct the case in his own right. If this issue had been raised in the trial court, this would have been clearly explained into this record. It wasn't. But the trial court and the appellate court of the court of appeal, Third Circuit in Louisiana, knew and understood that there was no investigative funding, there was no expert funding. There had been an assistant. This isn't a case where there was a lawyer appointed and they were waiting for the second lawyer. It's a case where they had found an assistant and were waiting for the first lawyer. How much money would be needed for investigation and experts before you would acknowledge that that would be competent representation? That's a very case-specific determination, Your Honor. And in Louisiana at that time rested with a judicial determination that the investigative or expert expenses were reasonably necessary to ensure a fair trial within the meaning of the due process clause. So it was a funding level tagged to the constitutional minimum of due process. Scalia. Of course, a finding by the district court or whichever court found it, that there was not enough money to pay counsel, to investigate, and to do whatever else, buy stamps. It is not a finding by the district court that there was not enough money to investigate and to buy stamps. Counsel was a part of that mix. You never had a finding that there was not enough money to pay counsel, right? Or I'm sorry, that there was not enough money to allow the counsel that has been appointed to investigate and buy stamps. Was there ever any such finding? There was never. The big tag item was paying counsel, wasn't it? No, Your Honor, that was one of the big tag items. But in a capital case, the investigation of both the guilt phase and the full mitigation and life investigation, along with the use of potential expert witnesses, particularly in a case where there were all the indications of mental health problems and the like, are often equal to, or in some cases greater than, the cost of counsel. And so, no, the big tag item wasn't just Mr. Lorenzi's overhead and expenses. The big tag item was providing adequate funding. And to return to your earlier point, Justice Scalia, just to make it clear, the Louisiana Supreme Court cases which mandate that a case cannot go forward without counsel do not reference Rule 31 at all or to counsel. They are cases which stand for the proposition that the case cannot go forward without constitutionally adequate counsel, counsel who can provide reasonably effective assistance. This case began in 2002. At that point, the controlling Louisiana decision on not moving forward without effective assistance was PERT, P-E-R-T, which we cite in our brief, which said that the Court will not allow a case to proceed without reasonably effective counsel during the life of this case. Breyer. From your point of view, would it satisfy you if we say the Louisiana court of appeal found the largest part of the delay involved the funding crisis experienced by the State of Louisiana? That meant giving you adequate money for counsel. Then they said the progression of the prosecution was out of the State's control as determined by this Court, which I think referred to that funding crisis. And we could — your view would be that's what they said. We don't know the underlying facts, but that's what they said. And insofar as they said that the State wasn't responsible for that part of the delay that they are talking about, they're wrong, because the State is responsible for not providing enough money, even if it's a problem. And to say they weren't responsible is wrong. Okay. That's what you want us to say. Yes, Your Honor.  And send it back. While you're up here. You would like us to say what Judge Cook said in her opinion, that responsibility for funding rests with the State, not with the defendant. Once an attorney is appointed, it is the State's obligation to ensure that adequate funds are available for the defense. And I take for the defense to mean not simply counsel, but the witnesses and the investigation. It is certainly true that none of the delay, due to lack of funds, was in any way attributable to the defense. That's essentially what you would like us to say. That is what Judge Cook stated. I don't think it's enough that none of the delay was attributable to the defense. The defense has to complain, has to demand its right to a prompt trial. What did your client do? Frankly, I am skeptical that a capital defendant who has already confessed to the crime wants to be tried as soon as possible. I'm skeptical about that. Now, what did your client do to demand his right to a prompt trial? Your Honor, what Mr. Boyer did was act at all times in full compliance with the procedural mechanism set up in Louisiana for doing that. At arraignment, he had already identified he was indigent and asked for counsel. At arraignment, he requested a jury trial. Right. His lawyer was appointed, and his lawyer immediately identified the funding problem and said, we need money or we can't go forward. Louisiana's statute bars counsel from filing a motion for speedy trial without an affidavit saying you're ready to go forward. Louisiana has said in Article 7 of the statute. Well, surely that's unconstitutional. Did counsel say, I demand a speedy trial? You can't condition my right to a speedy trial upon my getting some affidavit or something. It's a procedural rule. I am still waiting for anybody telling the Court, I demand a speedy trial, and if I don't get a speedy trial, you're violating the Constitution and I ought to go scot-free. Well, Your Honor, the rule I'm referring to is a procedural rule. It does not in any way limit the relief from a speedy trial, but you can't move for a speedy trial. You can move to quash because you've been denied one, but you can't move for one. It's exactly what this Court refers to in court. Isn't it true that he waited 3 years before doing that? That was the first point of which, under Louisiana procedure, he had a remedy available exactly as Judge Cook stated in her abstaining opinion. That was when he could move to quash. He could not move for a speedy trial in a valid motion for speedy trial without having an affidavit saying we're ready to go. Louisiana has passed that rule to stop pro forma requests for speedy trial. Can we clarify one point? Justice Scalia said something about a defendant facing the death penalty going scot-free. There was an armed robbery charge that was added in 2007. Do you dispute that a new clock started in 2007, the first time that the robbery charge was made? We do, Your Honor. That armed robbery charge is a lesser included offense of the first degree murder count. Mr. Boyer was originally indicted on first degree murder, which in Louisiana is intentional killing during the course of an armed robbery. There are other varieties, of course, but intentional killing during an armed robbery and those are the elements of first degree murder. The State unpacked those two elements or two lesser included offenses to second degree murder, which is intentional killing, and armed robbery. And the State, in fact, conceded that had the charge remained a first degree murder charge, then the armed robbery charge would have created a double jeopardy problem, and that's at page 3703-4 of the record, where counsel for the State indicated that the armed robbery charge could be added because the primary charge, the first degree murder, had been dropped to second degree murder and specifically said, Mr. Burke is correct, that had we filed for a first degree murder, there may be double jeopardy problems, but because they had unpacked that charge from murder and armed robbery, there was a double jeopardy problem. Kennedy, what about the basic problem in this case, as I understand the questions presented, is should the State be responsible when the funding problem is at a local level? So suppose you have a State that says, you know, we've had problems in funding. If we give this to the counties, it's going to be much better, and the counties are very, very good at raising money and knowing who the counsel are, so it's all handled by the county. Then one county has a disaster, a hurricane in that county particularly. Is that not a reason for delaying, or does the State have to immediately step in and supplement the funding? Can't the county say, oh, we need another two years? Justice Kennedy, I take it that's the issue that we're trying to decide here. Well, I think it starts with the proposition that it is the State, not the prosecutor, who has the responsibility to ensure a speedy trial in accordance with due process. And then the State can make all sorts of different arrangements, and the States around this country make different arrangements. But it's their responsibility to make sure that they work. And if they don't work, then the State is going to have to make reasonable accommodation for that to meet its responsibility. And so by assessing the cause of delay against the State, but within the Barker weighing framework, the courts dealing with speedy trial claims will be able to deal with short-term, unexpected exigencies. They will be able to weigh the reasonableness of the response. A valid reason for delay will justify that delay, as this Court said in Barker. But here the answer to the question, that's what I was trying to do with this case. The briefing is filled with whether he asked in time, whether he was delaying, whether he should have done some other thing, whether he should have gone. But the question that's asked is simply whether the failure to fund counsel is a factor that should be weighed against the State. And maybe it only gets very little weight because maybe there was a hurricane. And maybe it doesn't even matter because he didn't make the right motions. But the lower court said it shouldn't be weighed against the State, period. And do we have to do anything other than say, if you're right, yes, it should Now, how much weight it gets? Well, that depends. There was a hurricane. But it's something that they can't just ignore in the hearing. They have to figure out what happened and to the extent the State should have done more. It weighs against the State. Do you want any more than that? Yes, Your Honor. The first thing that we want is exactly that, Your Honor, that the court below incorrectly failed to attribute this to the State. And this Court, I accept, this Court could stop there and remand to the Third Circuit to deal with that in accordance with it. Not quite. I mean, the question presented is not as general as that. It's much more fact-bound. It says whether a State's failure to fund counsel for an indeterminate for five years, particularly where failure was the direct result of the prosecution's choice to seek the death penalty, should be weighed against the State for speedy trial purposes. I think this is inviting us to look into the facts of this case and decide whether this five-year delay, particularly since the prosecution chose the death penalty, you know, I don't like having to do that. But it seems to me that's what the question presented at least requires. Your Honor, I think it would be open to this Court to answer the question by saying the Court got it wrong at the first step by failing to attribute it to the State and then remand for a full consideration and weighing in light of that. What we have asked in our briefing for the Court to do is to also provide some guidance on the weight that should be given to delay resulting from a lack of funding, because in this case the State should be responsible. Alito If we provide that guidance, what do we do about the continuances that Mr. Lorenzi requested that relate to the funding? January 10, 2003, Lorenzi requests a continuance of funding hearing, citing scheduling problems. August 5, 2003, Lorenzi moves to continue hearing on motion to designate source of funds so that the indigent defender board can consider funding Boyer's case at an August 26 meeting. So this is, okay. Lorenzi moves to continue September 12, 2003. Lorenzi moves to continue hearing on motion to designate funds in trial so that the IDB may again consider the funding defense at its next meeting. December 15, Lorenzi moves to continue hearing on motion to designate funds, etc. There are many of these motions. What do we do with those? Your Honor, I'd suggest that this Court does exactly the same thing that the Louisiana court of appeal did with them, which was to find that it was the lack of funding, not any action by Mr. Lorenzi, which caused the delay. The Louisiana court of appeal declined to adopt the State's argument that it was Mr. Lorenzi's fault. And the reason it did that was because the lack of a funding hearing caused no delay at all in the conduct of this trial. The funding hearing, when conducted, produced no funding, no ruling or order, and had no influence on the date of the trial. And, of course, the right at issue is the right to go to trial, not to the timing of pretrial hearings. Furthermore, all of those continuances, which were joined in by the State, were related to trying to identify and find funding for this case and for this man. None of them were for a dilatory purpose. They were because a new procedure was announced to submit bills in a different way to the IDB, because the Louisiana supreme court had accepted the citizen  And ultimately, it was the State's fault. Roberts. Well, but, I mean, Justice Alito's problem, it seemed to me to get back to Justice Scalia's point, is that he seemed more interested in the funding than a speedy trial, funding that would be provided by the State under its procedures. In the absence of funding, there was no trial to be had. At the funding hearing or, I'm sorry, at the motion to quash hearing in November 2006, there was a colloquy between the trial court and the prosecutor in which the trial court said, what are we going to do with this case? They can't have a defense without money. This was not absolutely. And as Justice Alito pointed out on several occasions, what the defense lawyer said was, let's put it off and see if we can get funding. Let's put it off until there's the funding hearing. Let's put it off and put it off, as opposed to saying, I want a speedy trial. I'm entitled to it now. If you don't have the money, I don't get a speedy trial. I get off scot-free. Well, under Louisiana's Article 701, there was no filing a motion for speedy trial saying, please give me a speedy trial, set a date now. And at the same time — The Constitution requires such a motion. I mean, I don't care whether they have a, you know, a speedy trial motion. If denying him the right to speedy trial violates the Constitution, surely he is entitled to bring that to the attention of the Louisiana court, whether there's a specific statutory or rule provision or not. Your Honor, this Court in Barker, when dealing with this very topic under the issue of assertion, specifically said it would allow judges to take account of assertion in accordance with local procedural requirements. The local procedural requirement in a State that already has its own statutory prescriptive period, if you don't bring second-degree murder to trial within two years, you're out. Louisiana does not need a defendant to tell them that they have to bring a speedy trial, and they don't want a defendant doing it unless they're ready to go to trial themselves. They don't want the sort of pro forma assertion that was rejected. They don't even want counsel to say, you know, Your Honor, we've been trying to get funding, and we're just sick and tired of waiting for this. We demand a speedy trial, and if we don't get funding and, therefore, don't get a speedy trial, we think there's a constitutional violation and we're going to ask that the indictment be dismissed. Nobody ever made a statement like that to the Court, did they? In July 2005, Mr. Lorenzi moved to quash the indictment and said exactly that. He said it's too late. No funding, no trial, speedy trial is up. And it was still another two years before the funding crisis was solved. So there was a very lengthy period. If such notice were required, and that is not in our submission the message from Barker and the message from Article 701, they got that notice in July 2005 when there  And returning to your question, Your Honor. Something about that motion was withdrawn. The 2005 motion was withdrawn in 2006. If I can clarify that, Justice Ginsburg, Mr. Lorenzi was at pains to say he was not withdrawing the motion, but dismissing the motion to quash because he couldn't advance it in a successful way in Louisiana without demonstrating prejudice. Dismissing it instead of withdrawing it. That's the fine line he's drawing? He specifically Is that a line in Louisiana law? I don't know. Does this come from French law or something? It seems to me withdrawing and dismissing sound to me the same thing. Well, the point, Your Honor, was that he was not withdrawing his claim to a speedy trial, but rather dismissing his motion to quash on the violation of that. Withdrawing his motion to quash. So it was withdrawn, right? No, it was dismissed. He chose dismiss rather than withdraw as the word. And what he intended by that was that he wasn't saying I don't want one. He was saying I can't bring the type of hearing Louisiana reports require to get my Sixth Amendment motion to quash granted. I think what you, let's go back to that. It was his view that under Louisiana law to assert his Sixth Amendment right, he had to follow the procedure laid out in the Louisiana rule? To move for a speedy trial, he had to do exactly that. Under the Sixth Amendment, he had to comply with the requirements, the procedural requirements of Louisiana law. The local procedural requirements for how one goes about doing that. So then how do you, if he couldn't do it in 2002, 3, 4, or 5, how did he end up doing it in 5? It's the difference between moving for a speedy trial, please give me a trial date, I want to go to trial next week, and moving to quash because the speedy trial right has been violated. So why didn't he move to quash earlier? He moved to quash at the first moment that it became available under the State statute, which was at the 3-year mark. He moved one month after that 3-year mark, as soon as it became available. I'm sorry. Is there a law or a regulation in Louisiana that gives it a 3-year mark? Yes, Your Honor. Article 579 and following provides that the State must bring a first degree murder charge to trial within 3 years, or the case is prescribed, the indictment must be dismissed with prejudice. And so the State always knew it had that deadline. It didn't even set a trial date for a period of over 3 years in the middle of this, didn't even try to set a trial date for 3-1⁄2 years, didn't bring Mr. Boyer into court for 3-1⁄2 years to address his case at all. And so as soon as the remedy available became open, as Judge Cook said, in her opinion, defense counsel filed using exactly the remedy provided for. If there are no further questions, Your Honor, I will reserve the remainder of my time. Thank you, counsel. Ms. Siegler. Mr. Chief Justice, and may it please the Court. This Court should affirm the holding of the Third Circuit Court of Appeal for three separate reasons. The reasoning. Is delay because of the lack of funding attributable to the State or not? Or to the district attorney as agent of the State? Justice Sotomayor, I don't believe that the funding, that we can credibly argue that funding is completely outside the role of the State. So what's wrong with what's been suggested by some to remand to tell the Court below to whatever extent this was the basis of your decision it was wrong? Now, redo the markers, the factors. Your Honor, if you review the Third Circuit Court of Appeal's opinion, which is at least one factor, the factors are analyzed incredibly thoroughly with a mind to this Court's jurisprudence. And the rationale may be flawed with regard to that one point in this Court's opinion, but the result is not. So is one factor determinative always in this calculation? I thought it was a weighing factor. And so if it's a weighing factor, why isn't that in and of itself a factor that a court needs to weigh against the others? I think that this Court has always acknowledged in its Barker v. Wingo jurisprudence that there is no one talismanic factor. All of the factors are interrelated and all are reviewed. And that is why even if the Court disagrees with that one assessment of the Third Circuit's opinion, the result is sound. But how do we know that? How do we know that they would have reached the same determination if they had gotten it right on that single factor? I think when you look at the Third Circuit of Appeal's opinion, they specifically and with direct quotations to Barker v. Wingo go through every other factor in the analysis. And they discuss the fact of the repeated continuances of defense counsel of his own funding motion as part of the assertion of the right. But wait a minute. This is a vision. I'm sorry. Whether something is the State's fault is a significant factor in the analysis, and we've made that very clear in our cases. And so if they got that wrong, and you, I think, quite rightly are saying we can't defend that part of it. If they got that wrong, don't we at least have to say, okay, well, get it right now and do it again? Well, Justice Kagan, I don't think that what I would say is they got it completely wrong, because as this Court has acknowledged throughout its Barker jurisprudence, there are different weights you attribute to government action, whether it is negligence or whether it is a deliberate attempt on behalf of the State to evade giving a defendant his Sixth Amendment right to counsel. Kennedy. I would like to get the structure of your argument. You began to say there's three reasons. I'd just like to hear those three reasons so that I can understand the framework for all of these questions. Yes, sir, Justice Kennedy. The three reasons that we should affirm. The first reason is that, as in Vermont v. Brilliant, the delay occasion in this case was due to Petitioner's counsel's repeated request to continue his own funding motion, which delayed a source of funding when the Petitioner wished to proceed with capital-certified counsel. Okay. And the second? The second reason, Your Honor, would be pursuant to Loud Hawk, even if this Court determines that there was a negligence factor with regard to the State of Louisiana in not properly funding capital-certified counsel, there are valid public policy interests at play here, and the fact that Louisiana is generous enough to provide specially certified counsel to capital-ended defendants when there's no constitutional requirement for it to do so. And then our third argument, Your Honor, would be that based under the Barker v. Wingo jurisprudence, the delay should not be attributed to the State in this case because of Petitioner's failure to meaningfully assert his right to a speedy trial. Okay. Thank you. Yes, sir. How, on that, how could it possibly be Lorenzi's fault, which is what you said as your first point, when he said, pay me, Supreme Court of Louisiana, you have said that my operation as counsel for this indigent defendant doesn't become operative until I get paid, I have a right to get paid, all that counsel did was to say again and again, pay me, get the funds to pay me. I don't understand how in the world it could be the fault of an attorney who has not gotten one cent from the State, has a right to be paid before he engages in representation. How can it be his fault? Well, Justice Ginsburg, there are several reasons why it's Mr. Lorenzi's fault. The first of which is he filed a motion under State v. Wigley, and that's Appendix X of your Joint Appendix. In that motion, he identified State v. Wigley, and although he referenced wanting expert resources as well, he primarily based that motion on his entitlement to attorney's fees. I was going to ask you that question. Opposing counsel said that it wasn't primarily attorney's fees that's at issue here, but investigation costs. That makes a difference to me, because if it's just attorney's fees, he could have gone ahead with one attorney as far as I'm concerned. I agree with you, Justice Scalia, and if you look at Appendix LL, which is the hearing on the motion to quash, Mr. Lorenzi says point blank in that appendix, he says, I was not going to proceed to file substantive motions until I was funded. Doesn't he say at the same time, I couldn't do the investigation to make the motion required by the State? So didn't that implicate the funding for investigation? Well, Justice Sotomayor, if you look at Appendix LL where Mr. Lorenzi is speaking, he says, I've done substantial investigation on my own. Mr. Lorenzi had the assistance at that time of the LCAC with Ms. Christine Lehman assisting him as associate counsel. Were there funds for investigation? There were funds available in 2003 that Mr. Lorenzi did not avail himself of because he continued his funding motion eight times. Which funds? Which funds? There was a capital defense account that was held by the Calcasieu Parish Public Defender's Office. Mr. Lorenzi identified that account as a source of funding in Record Volume I, pages 193 to 194. He says in a letter to Judge David Painter, then the presiding trial judge, that he has identified a source of funds for his representation. In that same letter, he moves to continue a funding hearing that was at that time scheduled for the next month. Wait a minute. I was told, maybe I'm sort of misreading this record, that he was ultimately told that fund wouldn't be made available. That's not correct, Your Honor. If you read Appendix LL, Chief Public Defender Wanwer testifies that that fund had been used to pay other capital counsel in Calcasieu Parish. It had been used extensively. Now, by the time we get to the funding hearing, which was delayed because of Mr. Lorenzi, we're in 2006. At that time, there is a backlog in expenses that they are paying other capital counsel because they pay their bills on a first-come, first-served basis. Had Mr. Lorenzi proceeded to hearing in 2003, there was an identified account that would have paid him. He did not submit any bills to the Public Defender's Office to be paid. Ms. Sigler, on appeal, you said this. The State said because the defendant was without properly funded counsel for so long, the State simply could not ethically or legally bring him to trial. So what did you mean when you said that, that the State could not ethically or legally bring him to trial? Justice Kagan, what that statement meant was that we were aware of the fact that the Petitioner was at all times urging his privilege under Rule 31 to capital certified counsel. We did not want to be involved in the business of questioning a Petitioner's right to counsel. We did not feel that ethically we could do so under the rules of professional conduct. For us to interfere with that right would have been inappropriate in our view. Well, did you ever say to Mr. Boyer, you know, you can go ahead right now with this single counsel that you have? Was that ever a choice put to him? Or because the way I read all of your assertions below, and indeed the entire record below, is that everybody simply assumed that the case could not go forward in its present circumstances. Justice Kagan, I think that that assumption was made in part out of a desire to recognize Mr. Boyer's decision to try to pursue Rule 31 privileges. It certainly, I understand that. Well, a decision implies a choice. Was a choice ever put to him? He had a choice that was implicit, Your Honor, under Louisiana law, and he knew that and his counsel certainly knew that. Well, you didn't even know that. You said the State could not ethically or legally bring him to trial. How was he supposed to know that? Justice Kagan, our response in that particular phrase that you're speaking of has to do with our response to how the Petitioner has phrased this issue all along. The Petitioner has continuously phrased this issue as if he had a right to capital certified counsel. And, in fact, in his reply brief, that is what he states. I thought the Statement meant could not ethically or legally bring him to trial while he is insisting on his right to do counsel. That's correct, Justice Scalia. It would have been different if he had said, the devil with the second counsel, I want to prompt trial. That's correct. Then you would have felt that legally and ethically you could proceed. Yes, sir. Yes, Your Honor. What about your friend's argument that he couldn't ask for a speedy trial without an affidavit saying he was ready to go to trial? It's interesting that Petitioner argued that here today, because under Article 71 of the Code of Criminal Procedure, while an affidavit is listed in the statute as one requirement, as a matter of course, motions for speedy trial are granted pro se all the time that meet none of the requirements in that statute. In addition, Rule 31 does not say that a defendant who is trying to avail himself of Rule 31 can't file a motion for a speedy trial. It says nothing to that effect. Mr. Boyer was and had a limited education and a low IQ. Did anyone ever counsel him about this? No, you don't have to have two lawyers. You can have one. Did any judge ever tell him what his rights were? Well, Justice Ginsburg, I would first like to address that. I do not believe the Petitioner has a low IQ. In fact, that was refuted by our Dr. Charles Robertson at a competency proceeding. In fact, the results that was given from an IQ test when he was 15, the person administering it specifically stated that he was malingering, which would cause a 10-point drop in the accuracy. What was the level of his education? I believe his level of education was eighth grade. But I would. And he was expected to know all this about two counsel. You have a right to two counsel, but if the State isn't going to pay them, you can go forward with one counsel. Did anyone ever tell this man with an eighth grade education what his rights were? Justice Ginsburg, I don't believe that that specific discussion was ever had. Is he aware of that? His one counsel might have known. His one counsel. He did have one counsel. He had one counsel because he only graduated from the eighth grade. That's why we provide counsel. And that counsel could have known, no? Absolutely. In fact, Mr. Lorenzi was well aware of the fact that he could have chosen, the Petitioner could have chosen to proceed with just one counsel. But I'd also like to note, Justice Scalia, that from 2002 to 2004, he had three counsel. He had Mr. Lorenzi, he had Mr. Steven Singer, and he had Ms. Christine Lehman. He didn't just have one, he had three. And she was not, you know, you said that at all times he had at least two. It seems to me two paid counsel. Lorenzi wasn't paid, so it was Singer. Yes, ma'am. And then the woman, Lehman, was it? But when she started representing him, she didn't have the qualifications to be counsel. Well, Justice Ginsburg, as has been alluded to before, I believe, by Justice Scalia, she absolutely had the qualifications to serve as counsel as required by the Sixth Amendment. And she wouldn't, she couldn't be appointed counsel in a death case under Louisiana's rule. She met the qualifications for associate counsel. In fact, she was later certified in a motion filed by Mr. Lorenzi to be associate counsel. Yes, but in the very beginning, she wasn't even qualified to do that. Well, there was a provision, there is a provision in Louisiana law that allows someone to move for the admission and the certification of somebody as capital counsel, which was the procedure employed in this case. That's perfectly permissible. But Ms. Lehman at that time was a very experienced attorney. And we lay out her qualifications in brief. So while she may not have been perfectly qualified under Rule 31 to serve as lead counsel, she certainly was more than qualified. Scalia was a graduate of Yale Law School, wasn't she? She's a very impressive attorney. And another of his counsel, Mr. Singer, of the three that he had, he was a graduate of Harvard Law School, wasn't he? Yes, Your Honor. Son of a gun. Is that the minimum constitutional requirement? I would repeat that, Justice Sotomayor. Counsel is, you want to define constitutionally adequate counsel? Is it anybody who's graduated from Harvard and Yale? Or even just passed the bar? Or LSU Law. I would think, no, no, no. This is a very serious question, which is, I don't know that we've ever defined what the minimum qualification is for qualified counsel. But it is, some of it has to be the counsel themselves feel adequate to represent a capital defendant. I know plenty of lawyers who would never either volunteer or would resist being appointed to take on that kind of case, because it has many differences to a normal case. I would agree with that, Justice Sotomayor. But I would invite you to look at the motion that moved for the certification of Ms. Lehman, which is in the record. That motion. She's a very experienced trial counsel. There's no doubt of that. But was she a capital counsel? She was, Your Honor. That motion specifically refers to the seven capital cases she had worked on, and states that while at the LCIC, the Louisiana Capital Assistance Center, she had worked on other capital cases in an advisory position. Let me give you a holding. This is an incredibly factually complicated case. We don't usually take cases that are so fact-bound. But we've taken it. Let me give you a rule that we might adopt. If the failure to provide funding makes it impossible for some period of time for a case to be tried, then the delay is attributable to the State. Would you agree with that? If the failure to provide funding is a deliberate attempt on the State to interfere with a Sixth Amendment right to counsel, then I would agree with that. Breyer. You also agree right on this subject that the only sentence that I can find, I haven't read it totally carefully, but in the lower court opinion that has to do with this is the sentence I read before, and it says the first three years he was incarcerated, he was charged with first-degree murder, and the progression of the prosecution was out of the State's control as determined by this Court and the Supreme Court. Now, when I look at those words, I'm not 100 percent certain what they mean. So it would be helpful, but I don't want you're not going to do it, and I'd like to just put, are you, do you concede that that statement means they're saying that the State, for speedy trial purposes, is not to be held accountable really at all for not providing the money insofar as that's a cause of the delay? Is that a conceded point, or is that something I have to spend quite a lot of time going through? And if you don't concede that, what is it that you concede which would spare a little time going through this record? Justice Breyer, I regret to inform you that I do not concede that point. I believe that if you look at the answer to that question. I thought maybe you would not. I believe that if you look at Appendix D, as I stated earlier, the other Barker factors are discussed, and the continuance motions that were filed by defense counsel are mentioned with regard to the assertion of the right. They're not necessarily mentioned with regard to the State. Breyer, you're right. Most of this opinion, and almost all of it, is about the other factors. Now, I agree with you. That's what it looked like, but we do have this sentence. So how am I supposed to figure out whether that sentence really means what they say, or just is something they threw in to make the opinion more difficult for us to understand? I don't think that was the stated, the intention of the third sentence. No, I don't either. So I don't either. But what's the argument? It sounds as if it has something to do with funding. So what's the argument it doesn't? Well, I believe that we're not going to do that. I mean, it says, you see, as determined by this Court and the Supreme Court. What were they talking about? Well, I believe what the Third Circuit was referring to was this Court's Barker v. Wingo jurisprudence. This Court has stated repeatedly that even if something is not in the State's control. Oh, okay. Well, then that's it. They're referring to Barker. Okay. So when they say it's out of this State's control, as referred to in Barker, which is our case, then what they mean is that it's not something the State had anything to do with, so they shouldn't be blamed for it. I think that they are attempting in some fashion to reconcile some of this Court's later statements in the Barker jurisprudence, which this Court made it clear in Vermont v. Brilliant that certain actions are not going to be attributed to the State for speedy trial purposes. Sotomayor, can I take you back to Justice Alito's question? I'm sorry. That was a good segue. You added the word deliberate. Justice Alito, I think, has the question pending. Well, you agreed with the principle that I mentioned, except that you want to draw a distinction between the failure to provide funding and the deliberate failure to provide funding. Is that a real difference? Absolutely. Can a State inadvertently fail to provide funding? I think that this Court has always recognized in the Barker jurisprudence that negligence is a very different factor in how it weighs against the State than a deliberate attempt to violate a constitutional right. How can the Supreme Court do that? You at least said in Krillin delays resulting from a systemic breakdown in the public defender system could be charged to the State. So that suggests systemic breakdown doesn't necessarily mean deliberate. It just means there's been a breakdown, and the result is that the person can't get to trial. And I think if Justice Alito could even read that again, and if you think about it in light of this statement in Krillin that systemic breakdowns are systemic breakdowns, whether or not they're deliberate. Well, Justice Kagan, I think that the best evidence of the fact that there was no systemic breakdown is the funding hearing itself, Appendix JJ. At that funding hearing, there are extensive discussions about other capital cases within the State that are being tried the entire time this case is pending, including one case that we referred to, State v. Reeves in Calcasieu Parish, a capital case that went to trial in less than 4 years that included a retrial. Well, let's say you have a case where the defendant wants counsel, can't afford counsel, and the State says, we'd love to provide counsel for you, but we're broke. We just don't have any money to provide counsel. But maybe in a year we'll have money to provide counsel. Now, what do we do with the delay between that point and the point a year later when the money becomes available? Well, I think from that scenario, we would have to look at the State's intention. I certainly think that if the State flat out said, I'm sorry, you're not getting counsel for a year, then we would have to attribute that factor to the State more heavily, even though it does appear that in your scenario it's more of a negligence problem than a deliberate, we're not going to fund you problem. I suppose it is negligent. For a year, this person isn't represented because the State keeps sending the checks to his cousin of the same name. I mean, you know, they didn't do it purposely. He just happens to have a cousin, this lawyer, of the same name who doesn't tell him he's getting these checks out of nowhere. So he can't hire the expert. Absolutely negligence. I mean, that's not to be attributed to the State? No, Justice Breyer, clearly. Is there any authority for that? I mean, you know, maybe you discount it because it wasn't deliberate, but no attribution whatsoever? Well, you discount it, Justice Breyer, and you attribute it to more of a negligent standard than you would an absolute failure or refusal to provide counsel. And the Court has done that repeatedly. Sotomayor, the difference between saying, I'm broke and I want to pay the prosecutor because they kept paying the prosecutor, I want to pay for the prosecutor's investigation, but I won't pay you, what is the difference in applying the negligence versus deliberate standard? Look, in the end, States are always strapped. But I don't know a State who doesn't make some income. They make a choice about where they want that income to go, and it may be, in your judgment, a more legitimate decision. But why is the situation less negligent? Why is it negligent and not deliberate? Why is the choice one, not the other? Justice Sotomayor, I believe in this Court's decisions under Barker v. Wingo, the choice aspect, the deliberate intent aspect has been looked at by the courts in deciding how much of the blame is to be assessed against the State. Well, then answer the question. Why isn't the choice to say, I'm broke, so I don't want to pay you, I'm going to pay the prosecutor, which happened. Prosecutors were being paid throughout. They had enough money to investigate, but were choosing not to pay the defendants. Why isn't that a deliberate choice? Well, Justice Sotomayor, that choice was not made in this case. There was available funds. What we are here today. Available funds to pay the lawyer? There were available funds in 2003. I was referred to that letter in the record. The Court itself said repeatedly that the cause of the delay was the funding crisis. The Court said, well, we have to accept that as being the case, that the funding crisis, the effort to get this lawyer paid, failed time and again. And it was the Court determination that it is the funding crisis that caused the delay. Well, Justice Ginsburg, the funding crisis that the Court ruled on was present in 2006. It was not present in 2003 when this case started. Mr. Lorenzi himself identified a source of funds to pay him. And when we hear Chief Public Defender Ron Ware testify at that motion for funding hearing at Appendix JJ, he says, yes, I have a special capital defense account, and yes, I have been paying capital attorneys from this account throughout this time period. The fact that there weren't funds readily available in 2006 is directly attributable to Petitioner's counsel's failure to move his funding hearing forward in 2003, when he first identified that source of funds. This is not a case in which there was never any funding. This was a case in which defense counsel, for whatever reason, delayed a resolution of the funding issue, an issue that he himself identified as one without any resolution he was not going to go forward with substantive motions. The onus, the blame, or more of the blame in this case on the funding problem belongs with the Petitioner, not the State of Louisiana, whether we mean the prosecution or the legislature. Sotomayor, I'm going to argue the funding issue because I've got to go look at the record again. But let's assume that the record doesn't support your claim, because as I read the decisions below and the record that I saw, there wasn't funding available until I think it was 2006 or 2007. And so somehow there's a disconnect between what you're saying and the record. But let's assume that my hypothetical, that there wasn't money, despite what you're saying. What's your position then? Then it's not deliberate? It's still negligence? Justice Sotomayor, I maintain that position, and I believe it to be consistent with this Court's repeated analysis under Barker v. Bingo jurisprudence. You do look at the intent of the State as either a negligence factor akin to more of a neutral factor, a deliberate factor, or a valid reason for the delay. And I would also suggest to Your Honor, that there could never be a systematic breakdown, in your judgment, because anytime the State gives resources to something else, it's not a systematic breakdown. Justice Sotomayor, I would invite you to look at the motion for funding hearing again. There was money allocated to indigent defense by Louisiana. It has increased, and this is public record, and it's partially supported by the funding hearing. That money has increased from $9.4 million in 2006 to $20 million in 2005, to $20 million in 2006, to $33 million today. House Bill 1 of the State legislative website. That is the precise amount prosecutors are awarded by the State. I would again suggest that this is not a case of systemic breakdown. And I think that as a policy matter, this Court should be reluctant to rule against the State of Louisiana, which as Justice Scalia noted, has been so generous in trying to provide capital indigent defendants with specially qualified counsel, which is more counsel that they're even entitled to under the Sixth Amendment. And I would also urge this Court to be cognizant of its own repeated statements in the past, that this is a very severe remedy with regard to letting a convicted murderer free. And I'd also like to address before I sit down and turn this back over to Mr. Burke. Justice Ginsburg, earlier you had addressed the question of whether or not the armed robbery was, in fact, still a valid charge. Contrary to Mr. Burke's assertion before Your Honor today, if you look at Appendix 254A, there is a writ of opposition that was filed by the petitioner before the Louisiana Supreme Court. And at 254A, he says, and I quote, even if the murder indictment were quashed, Mr. Boyer faces the armed robbery prosecution. The Third Circuit also rejected Mr. Burke's current double jeopardy argument and stated specifically that there was no speedy trial problem with regard to the armed robbery. Thank you. Roberts. Thank you, counsel. Mr. Burke, you have three minutes remaining. Thank you. And I have a few points of clarification that I want to make just in a very quick fashion. Justice Sotomayor, there was no funding in 2001, 2002, 2003. It was never there. If Your Honor looks at the Louisiana Supreme Court opinion in Citizen, it will describe the Turner case funding hearing in 2001. Mr. Lorenzi was stuck with that one as well. There was no money. Mr. Lorenzi did indeed submit bills in 2003, because a new procedure had been announced, and that's at page, joint appendix page 401 to 3. You'll see the correspondence showing he did submit bills, and there was no money. There was money allocated, but if I understood the record correctly, by the State, the funding was grossly inadequate to cover all the needs? Look, it was underwater. It was oversubscribed. Scalia. Mr. Burke, would you respond to the last point made by opposing counsel? Burke. Yes. You did state, it's in appendix J, Even if the murder indictment were quashed, Mr. Boyer faces the armed robbery prosecution. Yes, Your Honor. That was the case. You told us today that that's not the case, that the armed robbery prosecution goes down the drain. Which is true? The passage you're referring to is from a writ application purely limited to the application of the State's Speedy Trial Statute, which does accord a new clock to every new filing. So under Louisiana State statutory law, the armed robbery started the State statutory clock again. But that is not the case for the Sixth Amendment. As to the murder or as to the independent robbery count, it's not a lesser included offense, the robbery count. The armed robbery was a lesser included of first degree murder, but it is not a lesser included of second degree murder. Our double jeopardy argument was the same force was applied in both the force for the murder and the force for the armed robbery, so that's completely irrelevant. But that was a State statutory argument about the armed robbery charge, which has no application in the Sixth Amendment. Mr. Boyer, why would we get to that question? I mean, no courts below have dealt with it. It's been briefed to us in a grand total of two paragraphs, I think. There would be no reason for us to get to that question. It is well beyond the question presented, Your Honor. I agree. Your Honor, the — And so from that point of view, we can assume that there is a robbery conviction that is still out there. He has a murder and armed robbery conviction from the same incident. It's the same charge as the first degree murder, just unpacked. Or assume that there isn't, right? That is why this Court would remand to allow the local court to deal with it and ensure that that's accurate. Justice Breyer, the reference to our earlier — the decision of this Court and the Supreme Court is a reference to the earlier decision on the interlocutory writ application, the earlier decision that a lack of adequate funds prevented the prosecution. And if Your Honor looks at Joint Appendix at page 126, which is part of the opinion of the Third Circuit, you'll see earlier in their opinion they discuss their own earlier ruling in the Supreme Court. Thank you, counsel. The case is submitted.